UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PETER SELLIE,

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    **07-CV-0475 (VEB)**
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## I. Introduction

Plaintiff Peter Sellie, challenges an Administrative Law Judge's ("ALJ")
determination that he is not entitled to disability insurance benefits ("DIB") under
the Social Security Act ("the Act").  Plaintiff alleges he has been disabled since
December 20, 2001, because of pain and limitations from obesity, asthma, non-
insulin dependent diabetes, sleep apnea, left tibial fracture, left shoulder pain,
and depression and anxiety.  Plaintiff met the disability insured status
requirements of the Act through June 30, 2005.

## II.  Background

Plaintiff filed an application for DIB on October 21, 2003.  His application
was denied initially and, under the prototype model of handling claims without
requiring a reconsideration step, Plaintiff was permitted to appeal directly to the
ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).   Pursuant to Plaintiff's request,
an administrative hearing was held on March 30, 2005, before ALJ Barry
Anderson, at which time Plaintiff, his wife, and his attorney appeared.  A
vocational expert testified via telephone.  The ALJ considered the case *de novo*,

and on June 7, 2005, issued a decision finding that Plaintiff was not disabled.  On February 1, 2006, the Appeals Council granted a review of the matter, vacated the decision, and remanded Plaintiff's case for a new hearing because the recording of the vocational expert's testimony was inaudible and could not be transcribed.  Plaintiff and his attorney appeared before ALJ Thomas Zolezzi for a hearing on July 11, 2006.  Again, a vocational expert testified via telephone.  The ALJ considered the case *de novo*, and on July 27, 2006, issued a decision finding that Plaintiff was not disabled.  On April 20, 2007, the Appeals Council denied Plaintiff's request for review.

On May 3, 2007, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on July 31, 2007, requesting the Court to dismiss Plaintiff's complaint. Plaintiff submitted Plaintiff's Brief on September 14, 2007.  On November 30, 2007, Defendant filed a Brief in Support of the Commissioner's Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

---

[1] The ALJ's July 27, 2006, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

For the reasons set forth below, this Court finds no reversible error and finds that substantial evidence supports the ALJ's decision.  Thus, the Court affirms the decision of the Commissioner.

### III.  Discussion

### A.  Legal Standard and Scope of Review:

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by

substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process[3] to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. § 404.1520, 416.920. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen,

---

[3] This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity. If he is not, the [Commissioner]next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work active-ties. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

482 U.S. at 146 n.5; <u>Ferraris v. Heckler</u>, 728 F.2d 582 (2d Cir. 1984).  The final

step of this inquiry is, in turn, divided into two parts.  First, the Commissioner

must assess the claimant's job qualifications by considering his physical ability,

age, education, and work experience.  Second, the Commissioner must

determine whether jobs exist in the national economy that a person having the

claimant's qualifications could perform.  <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R.

§ 404.1520(f); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954,

76 L. Ed. 2d 66 (1983).

### B. Analysis

### 1. Commissioner's Decision

In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above: (1) Plaintiff met the

insured status requirements of the Social Security Act through June 30, 2005 (R.

at 18);[4]  (2) Plaintiff has not engaged in substantial gainful activity since

December 20, 2001, the alleged onset date (20 C.F.R. §§ 404.1520(b) and

404.1571 *et.seq.*) (R. at 18); (3) Plaintiff has the following severe combination of

impairments: obesity, asthma, diabetes, sleep apnea, history of left tibial fracture,

history of left shoulder injury, depression and anxiety (20 C.F.R. § 404.1520(c))

(R. at 18); (4) Plaintiff does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525

and 404.1526) (R. at 19); (5) After careful consideration of the entire record, the

ALJ found that Plaintiff has the residual functional capacity to: perform work at a

---

[4] Citations to the underlying administrative are designated as "R."

sedentary[5] level of exertion, with standing every 30 to 45 minutes for 5 minutes
to stretch his legs; with no driving for business purposes; with access to a rest
room, two to four times daily, for ten minutes at a time; which does not require
climbing of stairs, ladders or scaffolds; with no exposure to concentrated gases,
fumes, odors, dust, smoke, or poor ventilation; with occasional but not frequent
overhead work with the non-dominant left arm; in simple, entry-level work with
simple decision-making, but no complex decision-making; and with no contact
with dangerous machinery, such as knives, blades or saws (R. at 20); (6) Plaintiff
is unable to perform any past relevant work (20 C.F.R. § 404.1565) (R. at 22); (7)
Plaintiff was born on January 31, 1967 and was 34 years old on the alleged
disability onset date, which is defined as a younger individual age 18-44 (20
C.F.R. § 404.1563) (R. at 22); (8) Plaintiff has at least a high school education
and is able to communicate in the English language (20 C.F.R. § 404.1564) (R.
at 22); (9) Transferability of job skills is not material to the determination of
disability because using the Medical-Vocational Rules as a framework supports a
finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job
skills (SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2) (R. at 23); (10)
Considering Plaintiff's age, education, work experience, and residual functional
capacity, there are jobs that exist in significant numbers in the national economy
that Plaintiff can perform (20 C.F.R. §§ 404.1560(c) and 404.1566) (R. at 23);
and (11) Plaintiff has not been under a disability, as defined in the Social Security

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and standing is often necessary in
carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and
other sedentary criteria are met.  See 20 C.F.R. § 404.1567(a).

Act, from December 20, 2001, through the date of this decision (20 C.F.R. § 404.1520(g)) (R. at 24).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 24).

### 2.      Plaintiff's Claims

Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (a) the ALJ did not properly evaluate Plaintiff's obesity in combination with his other impairments to determine if Plaintiff's combined impairments met or medically equaled a listing at 20 C.F.R. Part 404, Subpart P, Appendix 1, (b) the ALJ erred by rejecting Plaintiff's claim that the residual effects from his left leg fracture met or medically equaled the listing at 20 C.F.R. Part 404, Subpart P, Appendix 1, 1.02A  (c) the ALJ failed to properly consider the opinions of Plaintiff's treating physicians with respect to Plaintiff's limitations and his residual functional capacity, and (d) the ALJ erred in his assessment of Plaintiff's credibility when he found that Plaintiff could perform a limited range of sedentary work.  Plaintiff asserts that the ALJ's determination that he is "not disabled" at step five in the sequential evaluation must be reversed as it is not supported by the substantial evidence in the record.  See Plaintiff's Brief, pp. 7-17.

### a.      The ALJ Properly Evaluated Plaintiff's Obesity In Combination With His Other Impairments When Finding His Combined Impairments Did Not Meet Or Medically Equal A Listed Impairment

Plaintiff's first challenge to the ALJ's decision is that he improperly found that his obesity, in combination with his asthma, diabetes, sleep apnea, knee and

shoulder pain, hypertension, hyperlipidemia, and depression and anxiety, did not

meet or equal the level of a listed impairment at 20 C.F.R. Part 404, Subpart P,

Appendix 1.  See Plaintiff's Brief, pp. 10-12.  Plaintiff argues that by failing to

consider Plaintiff's obesity in combination with his other impairments, the ALJ

erroneously concluded that Plaintiff retained the residual functional capacity to

engage in a limited range of sedentary work and thus, was not disabled under

the Act.  See Plaintiff's Brief, p. 12.  The Commissioner argues that the ALJ

properly considered Plaintiff's obesity in combination with all of his other

impairments at each step in the sequential evaluation process, and his finding

that Plaintiff retained the capacity to engage in a limited range of sedentary work

was correct.  See Defendant's Brief, p. 10.

"Disability" is defined as the inability to engage in any substantial gainful

employment by reason of any medically determinable impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months.  See 42 U.S.C.A. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his or her

physical or mental impairment or impairments are of such severity that he or she

is not only unable to do his or her previous work, but cannot, considering age,

education, and work experience, engage in any other kind of substantial gainful

work which exists in the national economy.  See 42 U.S.C.A. § 423(d)(2)(A).

Thus, the presence of a severe impairment or multiple impairments is insufficient

to establish disability absent evidence that Plaintiff has functional limitations that

would preclude him from engaging in any substantial gainful activity.  See

Coleman v. Shalala, 805 F. Supp. 50, 53 (S.D.N.Y. 1995); Rivera v. Harris, 623 F.2d 212, 215-216 (2d Cir. 1980).

On October 25, 1999, the SSA deleted Listing 9.09, Obesity, from 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 64 FR 46122 (1999).  The SSA explained, "Although many individuals with obesity are appropriately found "disabled" within the meaning of the Social Security Act (the Act), we have determined the criteria in listing 9.09 were not appropriate indicators of listing level severity because they did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity."  Id.  Instead of treating obesity as a listed impairment, the SSA provides guidance to adjudicators when evaluating claims where obesity is a factor in the prefaces of Listings sections 1.00Q (Musculoskeletal System), 3.00I (Respiratory System), and 4.00F (Cardiovascular System).  See 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 1.00Q, 3.00I, 4.00F; SSR 02-1p.  The SSA reminds adjudicators that obesity is a medically determinable impairment, and that the combined effects of obesity with any other impairment can be greater than the effect of any single impairment considered separately.  See SSR 02-1p.  Further, adjudicators are instructed to consider the effects of obesity not only under the listings, but at all steps of the sequential evaluation process, including when assessing if a claimant retains the residual functional capacity to participate in substantial gainful activity.  Id.

The Commissioner's regulations do not prescribe a specific level of weight or body mass index (BMI) that equates to a severe impairment, or to a non-

severe impairment.  See SSR 02-1p.  Instead, an ALJ must assess the limiting effects of obesity on a claimant's functioning to determine if his or her obesity rises to the level of a severe impairment.  Id.  In this matter, the ALJ followed the requirements of SSR 02-1p.  The ALJ determined Plaintiff's obesity is a severe impairment because it has more than a minimal effect on his functioning (R. at 18).  He then proceeded to evaluate Plaintiff's other impairments, both severe and non-severe, in combination with Plaintiff's obesity to determine if any of the impairments, either singly or in combination, met or medically equaled a listing (R. at 18-20).  As an example, the ALJ considered the residual effects of Plaintiff's left tibial fracture on his ability to walk (R. at 19).  The ALJ noted that after Plaintiff's leg injury in May 2005, the Plaintiff underwent surgery followed by a stay at a rehabilitation hospital (R. at 19, 293-294, 305-309, 310-328).  Plaintiff met his rehabilitation goals, was discharged from the rehabilitation hospital, and continued treatment with an orthopedic physician (R. at 19, 296, 297, 298, 299, 300, 310-328).  In an office note dated December 19, 2005, the doctor reported Plaintiff was doing well and that his walking had improved (R. at 296).  Plaintiff's incision near his left knee was well-healed, he had excellent range of motion in the knee, and full motor and sensory function in his left distal limb.  Id.  Plaintiff reported to the doctor that he had soreness and swelling in his left knee "after prolonged activities."  Id.

As a second example that the ALJ considered Plaintiff's impairments in combination with his obesity, the ALJ considered Plaintiff's severe sleep apnea, a condition frequently affecting those who are obese (R. at 19).  See SSR 02-1p.

The ALJ included sleep apnea in Plaintiff's severe combination of impairments, but found the medical evidence revealed sleep apnea had little or no effect on Plaintiff's ability to function as long as he was fully compliant with the use and maintenance of his BiPap[6] machine (R. at 19, 272-273, 274, 275, 337, 339-340). The same is true for Plaintiff's non-insulin dependent diabetes mellitus (NIDDM). As long as Plaintiff took his medication as prescribed by his treating physician, this condition remained under good control and did not cause any exertional or non-exertional functional limitations (R. at 19, 167, 168, 185-188, 212, 218-220, 287, 289, 335-336).

The ALJ also considered Plaintiff's subjective complaints about his pain and limitations caused by obesity in combination with his other impairments, including his need to use the toilet frequently, his inability to walk or stand for prolonged periods of time, his complaints of lower back and shoulder pain, and his need to nap each day (R. at 21).  While the ALJ found Plaintiff to be credible for the most part with respect to reports about his symptoms, the ALJ did not find the reported symptoms consistent with a finding of total disability.[7]  Id.  Thus, the ALJ considered the limiting nature of Plaintiff's medically determinable impairments, and his reported symptoms, when finding Plaintiff retained at most the residual functional capacity to engage in a limited range of sedentary work.

---

[6] The BiPap machine (Bi-Level Positive Air Pressure Machine) is a small, bedside respiratory machine connected to tubing and a facemask worn by the user. The BIPAP machine helps the user's breathing by pushing air into the lungs and holding the lungs open to allow more oxygen to enter the lungs.  See http://www.icu-usa.com/tour/equipment/bipap.htn.

[7] A more thorough discussion of the ALJ's credibility finding is contained in section (d) below.

After a thorough review of the ALJ's decision, the Court finds the ALJ did not err because he did not fail to consider the combined effects of Plaintiff's obesity and other severe impairments on his ability to function.  The ALJ carefully considered the combined effects of all of the Plaintiff's impairments, including obesity, at each step of the sequential evaluation (R. at 18-24).  He determined that Plaintiff's combined impairments did not meet or medically equal a listing at 20 C.F.R. Part 404, Subpart P, Appendix 1, and did not render him disabled within the meaning of the Social Security Act (R. at 19-20).  However, the ALJ found that given Plaintiff's severe impairments, he could not return to his past relevant work as that work required a great deal of standing and walking (R. at 20-22).  He incorporated many of Plaintiff's claimed physical and mental limitations into his assessment of Plaintiff's residual functional capacity and determined that at most, Plaintiff retained the residual functional capacity to perform a limited range of sedentary work (R. at 23-24).  The ALJ then enlisted the services of a vocational expert to document a significant number of jobs in the national and local economies suitable to a person with all of Plaintiff's physical, as well as mental limitations.  Id.

> **b.     The ALJ Did Not Err When Finding That The Residual Effects From Plaintiff's Left Leg Fracture Did Not Meet a Listed Impairment**

Plaintiff's second challenge to the ALJ's decision is that he improperly found that the residual effects from his left leg fracture did not meet or medically equal the listing at 20 C.F.R Part 404, Subpart P, Appendix 1, 1.02A.  See Plaintiff's Brief, p. 7.  The Commissioner argues that Plaintiff has failed to meet

his burden by proving that the residual effects from his left leg fracture meet both the severity and the longevity requirements of the Act to be considered a disabling listed impairment. <u>See</u> Defendant's Brief, p. 13.

As discussed in section (a) above, "Disability" is defined as the inability to engage in any substantial gainful employment by reason of any medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  <u>See</u> 42 U.S.C.A. § 423(d)(1)(A).  However, the mere presence of a severe impairment or multiple impairments is insufficient to establish disability; the claimant must present evidence that he or she has functional limitations resulting from the impairment that would preclude participation in any substantial gainful activity.  <u>See</u> <u>Coleman v. Shalala</u>, 805 F. Supp. 50, 53 (S.D.N.Y. 1995); <u>Rivera v. Harris</u>, 623 F.2d 212, 215-216 (2d Cir. 1980).

With respect to Plaintiff's claim that the residual effects of his broken left tibia meet the listing at 1.02A, the listing requires:

> *Major dysfunction of a joint(s) (due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively…

Plaintiff's medical record documents that he broke his left tibia in a fall down stairs on May 8, 2005 (R. at 304-309).  To repair the broken bone, Plaintiff

underwent an open reduction internal fixation procedure (ORIF)[8] on May 9, 2005

(R. at 293-294).  Four days after surgery, Plaintiff entered a rehabilitation hospital

where he completed a program to increase his mobility and independence while

his leg fracture healed (R. at 314-315).  Plaintiff was discharged from the

rehabilitation hospital to his home on May 20, 2005 (R. at 314).  He was followed

by his treating orthopedic specialist, Dr. DiCaprio, after his release from the

rehabilitation hospital until December 19, 2005 (R. at 296, 297, 298, 299, 300).

During this time, the doctor noted Plaintiff was compliant with treatment

recommendations and he made good progress with his recuperation.  Id.  As an

example, on August 3, 2005, Dr. DiCaprio reported that Plaintiff's incision had

"healed up nicely," and that Plaintiff had admitted to some partial and full weight

bearing on his left leg without the assistance of a walker (R. at 298).  Plaintiff

denied any pain with weight bearing on his left leg.  Id.  The doctor

recommended he begin progressive weight bearing as tolerated.  Id.  On

September 28, 2005, Dr. DiCaprio noted that Plaintiff had been doing well (R. at

297).  He had a mild limp, occasional left knee pain, and excellent knee range of

motion.  Id.  X-rays showed a stable internal fixation of the tibial fracture.  Id.

Plaintiff followed up with Dr. DiCaprio again on December 19, 2005 (R. at 296).

The doctor reported Plaintiff was doing well, although he had an "arthritic type of

lateral knee pain."  Id.  Plaintiff's walking had improved, but he had "soreness

and swelling after prolonged activities."  Id.  Upon physical examination, the

---

[8] Open reduction internal fixation (ORIF) is a method of surgically repairing a fractured bone.
Generally, this involves either the use of plates and screws or an intramedullary (IM) rod to
stabilize the bone.  See http://orthopedics.about.com/cs/brokenbones/g/orif.htm.

doctor noted Plaintiff had full motor and sensory function in his distal limb.  Id.

Dr. DiCaprio recommended Plaintiff stay as active as possible, and schedule

additional appointments with him on an "as needed" basis.  Id.  Plaintiff's record

contains no additional evidence from Dr. DiCaprio, and Plaintiff reported no

problems with his left knee or leg that would rise to the level of disabling intensity

to any of his other treating physicians (R. at 297, 301, 335-336, 337, 339-340).

       The residual effects of Plaintiff's left tibial fracture, including pain and

swelling with prolonged activity, exhibit neither the severity required to meet or

equal a listed impairment, nor do the documented signs and symptoms from this

impairment, even when considered with Plaintiff's obesity, render him totally

disabled within the meaning of the Act for a period of twelve months or longer.

See 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02A; see also 42

U.S.C. § 423(d)(1)(A).  His mobility, and the leg and knee pain he suffered as the

result of his left tibial fracture, was significantly improved within 8 months of

diagnosis (R. at 293-294, 296-300, 305-309, 310-328).  Plaintiff's orthopedic

specialist reported he was doing well even though he had an arthritic type of

lateral knee pain, and his walking had improved even though he had soreness

and swelling after prolonged activities (R. at 296).  Plaintiff exhibited excellent

range of motion in his knee and full motor and sensory function in his left distal

limb.  Id.  The ALJ acknowledged that Plaintiff's signs and symptoms related to

the residual effects of his left tibial fracture in combination with his other

impairments were severe in that they had more than a minimal effect on his

ability to function on a day to day basis; however, it is clear that the severity of

this impairment, even in combination with Plaintiff's other impairments does not rise to listing level (R. at 18-19).  See 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02A.

Thus, after careful examination of Plaintiff's evidence pertaining to the residual effects of his left tibial fracture in combination with his other severe impairments, the Court finds the ALJ properly evaluated the medical and other evidence when determining this impairment did not meet or equal the severity required for a finding of disability under listing 1.02A, and the residual effects of the injury did not last, or were not anticipated to last, for a period of 12 months or longer.  See 20 C.F.R. Part 4, Subpart P, Appendix 1, 1.02A; 42 U.S.C. § 423(d)(1)(A).

### c. The ALJ Properly Considered the Opinion of Plaintiff's Treating Physician Regarding His Residual Functional Capacity To Engage In A Limited Range Of Sedentary Work

Plaintiff's third challenge to the ALJ's decision is that he failed to follow the treating physician rule by ignoring the medical findings and opinions of Plaintiff's treating physician that Plaintiff is morbidly obese, suffers severe apnea, has obstructive airway disease and degenerative joint disease as a residual effect of his broken tibia and is totally and permanently disabled.  See Plaintiff's Brief, pp. 15-16.  Thus, Plaintiff asserts the ALJ's determination that he retained the residual functional capacity to perform a limited range of sedentary work is not based on the substantial evidence of record.  See Plaintiff's Brief, p. 16.  The Commissioner argues that the ALJ properly evaluated the medical opinions of Plaintiff's physicians, and in fact, gave great weight to the assessment of

Plaintiff's treating physician when he determined Plaintiff retained the residual functional capacity to engage in a limited range of sedentary work.  See Defendant's Brief, pp. 16-18.

According to the "treating physician's rule,"[9] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

---

[9] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinions of Plaintiff's treating physicians, Drs. Kronick, Sher, DiCaprio, and Kerner, and his treating psychologist, Dr. Nicholson, nor with the ALJ's consideration of the opinions of State agency examiners, Drs. Chhabra and Hanna. Rather, the ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on December 20, 2001, through the date of the ALJ's decision on July 27, 2006 (R. at 16-24). The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 146-340). The opinion of Dr. Kronick that Plaintiff is permanently disabled and unable to perform the exertional and non-exertional requirements of even a limited range of sedentary work was issued on August 25, 2006, one month after the ALJ's decision (R. at 332-334). Thus, the ALJ was unaware that Dr. Kronick had issued this opinion[10]. However, the ALJ carefully considered the medical records and opinions of Dr. Kronick that pertained to the time frame relevant to Plaintiff's claim, as well as the medical records and opinions of other physicians who examined and/or treated Plaintiff, and these records support the determination by the ALJ that Plaintiff was not under a disability from December 20, 2001, through July 27, 2006.

Plaintiff's medical record documents that he suffers from morbid obesity, severe sleep apnea, non-insulin dependent diabetes mellitus, asthma, depression and anxiety, and bone degeneration and residual pain from a break

---

[10] The Appeals Council examined the August 25, 2006 opinion evidence of Dr. Kronick but declined to review the ALJ's decision. Plaintiff does not challenge the final decision of the Commissioner on the basis that the Appeals Council's failed to review the ALJ's decision after new and material evidence had been submitted.

to his left tibia, as well as a left shoulder injury, sustained in a fall down stairs.

Plaintiff was first examined by his regular treating physician, Dr. Kronick, on

February 16, 2000 (R. at 177).  Dr. Kronick noted Plaintiff weighed more than

400 pounds, and recommended Plaintiff have a nutrition evaluation.  Id.  Dr.

Kronick examined Plaintiff again on May 30, 2001, when Plaintiff complained of

sharp chest pains (R. at 175-176).  The doctor opined that Plaintiff's pain was

unlikely to be the result of a cardiac condition (R. at 176).  He noted Plaintiff had

asthma and was a smoker, and renewed Plaintiff's prescription for an inhaler.  Id.

Plaintiff followed up with Dr. Kronick on January 21, 2002, when he

reported to the doctor that he was unable to work because he suffered low back

pain, leg pain, and leg swelling when he stood, and dyspnea[11] when he walked

long distances (R. at 172).  The doctor's notes show that he completed a

temporary disability form for Plaintiff.  Id.

On March 6, 2002, Plaintiff was examined by a State agency physician,

Dr. Chhabra (R. at 148-152).  Plaintiff reported he had asthma that bothered him

during the summer, back pain if he stood longer than 30 minutes at a time, and

difficulty walking and climbing stairs (R. at 148).  He also reported he had been

diagnosed with sleep apnea in 1998, and used a CPAP[12] machine.  His only

medications were an inhaler for asthma, and Motrin for pain (R. at 149).  Upon

physical examination, Dr. Chhabra noted Plaintiff was six feet and 3 inches tall,

---

[11] Labored respiration.  See http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=dyspnea.

[12] CPAP (continuous positive airway pressure) is a machine that delivers slightly pressurized air during the breathing cycle.  See http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/001916.htm. Although the medical record at this point called his apnea breathing machine a CPAP, all other parts of the record refer to a BiPap machine.

and weighed more than 500 pounds.  Despite Plaintiff's size, the doctor reported

fairly normal results from the examination (R. at 149-152).  Dr. Chhabra opined

Plaintiff had no limitations with speech, vision or hearing, and no limitations with

his upper extremities for fine and gross motor activities (R. at 152).  He assessed

Plaintiff as having moderate limitations with walking distances and climbing

stairs, and mild limitations with household activities, because of his obesity, back

pain, and asthma.  Id.

On March 12, 2002, Plaintiff was treated again by Dr. Kronick (R. at 168).

Dr. Kronick diagnosed Plaintiff with non-insulin dependent diabetes mellitus.  Id.

Plaintiff followed up with Dr. Kronick on April 15, 2002, and reported he had lost

some weight after counseling with a nutritionist (R. at 167).  The doctor

recommended Plaintiff start walking for one-half hour daily.  Id.

Plaintiff was examined by another State agency physician, Dr. Manna, on

January 23, 2004 (R. at 185-188).  Plaintiff reported his medical problems as mild

to moderate shortness of breath with prolonged walking, extreme obesity, and

non-insulin dependent diabetes mellitus (R. at 185).  Again, despite Plaintiff's

size, his physical examination revealed fairly normal results (R. at 186-188).  Dr.

Manna opined Plaintiff had a mild to moderate restriction for activities requiring

running and a restriction for mild or greater exertion because of morbid obesity

(R. at 188).  The doctor also recommended Plaintiff avoid smoke, dust, and other

respiratory irritants because of his asthma.  Id.

On April 30, 2004, Plaintiff underwent a complete physical by Dr. Kronick

(R. at 218-220).  He reported to the doctor that he had edema in his feet with

prolonged standing, chronic dyspepsia, and occasional diarrhea (R. at 218-219).

Dr. Kronick noted Plaintiff had pitted edema in his knees and feet (R. at 220).

Plaintiff admitted he had not been compliant with his diet, and had run out of his

diabetes medication (R. at 218).  The doctor suspected Plaintiff had uncontrolled

non-insulin dependent diabetes mellitus, and ordered blood tests (R. at 220).

One week later, on May 6, 2004, the doctor revised Plaintiff's medication plan to

bring his blood sugars under better control (R. at 217).

Plaintiff began treatment for depression and anxiety with a psychologist,

Dr. Nicholson, on January 17, 2005 (R. at 201-202).  He told Dr. Nicholson he

was unemployed, could not keep a job, and generally was not a good worker.  Id.

Plaintiff saw Dr. Nicholson on approximately a bi-weekly basis from January

2005 until May 2005 (R. at 201-202, 205, 206, 207, 208-211, 280, 281, 282, 283,

284).  On March 21, 2005, Dr. Nicholson completed a Mental Residual

Functional Capacity Assessment of Plaintiff (R. at 208-211).  She assessed

Plaintiff as having a generally good ability to make occupational adjustments, a

generally good ability to make performance adjustments, and a generally good

ability to make personal and social adjustments (R. at 209-210).  Dr. Nicholson

noted Plaintiff's sleep apnea affected his daytime alertness, and his fear of injury

would limit his physical abilities (R. at 211).

While Plaintiff was being treated by Dr. Nicholson for depression, he also

continued treatment with Dr. Kronick for his physical ailments.  Dr. Kronick

completed a Physical Capacities Evaluation of Plaintiff on March 11, 2005 (R. at

199-200).  He assessed Plaintiff as able to sit eight hours out of an eight-hour

workday, to stand for one to two hours total out of an eight-hour workday (but no longer than one hour at any given time), and to walk for one to two hours total out of an eight-hour workday (but no longer than one hour at any given time) (R. at 199). Dr. Kronick opined Plaintiff would need to change positions frequently, or be able to lie down, to relieve pain. Id. The doctor set no limitation on the number of hours Plaintiff could work each day. Id. Dr. Kronick assessed Plaintiff as able to occasionally lift and carry up to 20 pounds, and use his hands for repetitive actions without limitation. Id. The doctor noted Plaintiff should not use his feet and legs for repetitive movements such as pushing and pulling of leg controls, and should not bend, squat, crawl or climb (R. at 200). Dr. Kronick also opined Plaintiff should avoid unprotected heights, moving machinery, exposure to heat, humidity, temperature changes, dust, fumes and gases, and driving automotive equipment. Id.

On April 13, 2005, Plaintiff was treated by Dr. Sher for sleep apnea (R. at 277-278). The doctor noted Plaintiff had not followed up for re-titration of his BiPap machine for approximately seven years (R. at 277). Plaintiff complained of severe daytime sleepiness and Dr. Sher recommended Plaintiff undergo a sleep study (R. at 277-278). Plaintiff completed the sleep study on April 29, 2005 (R. at 273-274). Even though he was diagnosed with severe obstructive sleep apnea, he had a very good response to an increased pressure setting on his BiPap machine (R. at 273). Dr. Sher reported Plaintiff had good sleep efficiency when using the machine. Id. The doctor advised Plaintiff to begin regular home use of his BiPap machine at the increased pressure setting. Id.

As outlined extensively above, Plaintiff fell down stairs on May 8, 2005, breaking his left tibia and injuring his left shoulder (R. at 293-294).  He underwent surgery to repair his left tibia, and after a week long stay in a rehabilitation hospital to increase his mobility and self care skills, Plaintiff was discharged to recuperate at home (R. at 310-328).  Plaintiff's ability to walk steadily improved, and on December 19, 2005, his orthopedic specialist, Dr. DiCaprio, opined he was "doing well," and had "an arthritic type of lateral knee pain…His walking has improved but has soreness and swelling after prolonged activities" (R. at 296).  The doctor assessed Plaintiff as having a healed lateral plateau fracture with post-traumatic degenerative changes.  He advised Plaintiff to stay active and return for follow up visits as needed.  Id.

On January 27, 2006, Plaintiff reported to Dr. Kronick that his left leg was slowly improving, although he complained that his left shoulder was still bothering him (R. at 287).  Dr. Kronick referred Plaintiff to an orthopedic specialist, Dr. Kerner, for an examination on February 2, 2006 (R. at 301).  Plaintiff had full range of motion in his shoulder and no instability, but did have pain with rotator cuff testing.  Id.  X-rays of the left shoulder revealed normal results.  Id.  Dr. Kerner assessed Plaintiff with a possible rotator cuff tear or tendonitis.  Id.  He recommended Plaintiff undergo a program of physical therapy.  Id.

On February 8, 2006, Plaintiff's attorney sent a letter to Dr. Kronick asking him to rate Plaintiff's level of disability (R. at 285).  Dr. Kronick rated Plaintiff's level of disability as "total" from May 8, 2005, to approximately February 8, 2006, and opined that Plaintiff's current level of "total" disability was temporary.  Id.

Approximately five and one-half months later, and one month after the ALJ issued his decision finding Plaintiff retained the residual functional capacity to engage in a limited range of sedentary work, Plaintiff's attorney sent another letter to Dr. Kronick asking him to rate Plaintiff's level of disability (R. at 332).  Dr. Kronick assessed Plaintiff as totally and permanently disabled from the year 2000 through the date of Plaintiff's most recent physical examination on August 25, 2006.  Id.  The doctor also completed another Physical Capacities Evaluation of Plaintiff wherein he rated Plaintiff as having the residual functional capacity to perform less than a limited range of sedentary work (R. at 333-334).

The ALJ found Plaintiff capable of performing, at most, a limited range of simple, entry-level sedentary work based on the totality of evidence presented by his treating physicians, consulting physicians, treating psychologist, test results, and the opinions of State agency examining physicians.

After examining the information in Plaintiff's medical record, there is no question that he suffers from several severe impairments, and these impairments are complicated by his morbid obesity.  However, despite Plaintiff's obesity and his other impairments, the results from his physical examinations and tests have yielded relatively normal results.  As an example, Plaintiff was examined by a State agency physician, Dr. Chhabra, on March 6, 2002 (R. at 148-152).  Plaintiff weighed more than 500 pounds at the time, and reported he had asthma that bothered him during the summer, swelling in his feet and ankles, difficulty walking significant distances or standing for prolonged periods of time, and sleep apnea treated with a CPAP machine (R. at 148-149).  Plaintiff told Dr. Chhabra

that he was independent in his activities of daily living, could cook, clean, and do laundry, and could drive a car and use public transportation (R. at 149).  His physical examination revealed fairly normal results, although the doctor noted Plaintiff had moderate limitations with walking distances and climbing stairs because of obesity, back pain, and asthma (R. at 152).  The doctor assessed Plaintiff had mild limitations in his ability to perform household activities.  Id.  Almost two years later, on January 23, 2004, Plaintiff was examined by another State agency physician, Dr. Hanna (R. at 185-188).  In the interim, he had been diagnosed with non-insulin dependent diabetes mellitus and had undergone surgical repair of a hernia (R. at 185).  Plaintiff reported that along with obesity, he had mild asthma, mild to moderate shortness of breath with prolonged walking, and sleep apnea managed by a BiPap machine.  Id.  Plaintiff also reported to Dr. Hanna that he was independent in his activities of daily living, and could cook, clean, do laundry, and shop (R. at 186).  As with the earlier State agency physical examination, this examination revealed fairly normal results (R. at 186-188).  However, Dr. Hanna opined that because of Plaintiff's obesity and asthma, he had a mild to moderate restriction for any activity that required running, a restriction for any activity that required more than mild exertion, and that he should avoid smoke, dust and other respiratory irritants (R. at 186-188).

While Plaintiff was diagnosed with severe sleep apnea by Dr. Sher in 1997, he failed to follow up with his physician to make certain he was obtaining the best results from his CPAP or Bi-Pap machines (R. at 277).  Plaintiff was again diagnosed with severe sleep apnea in April 2005, and when he was 100

percent compliant with using his BiPap machine as directed, Dr. Sher reported
he was doing well and had no problems (R. at 275).

With respect to his broken left tibia in caused in his May 2005 accident (R.
at 296-300), after undergoing a surgical repair of the bone, he was treated by Dr.
DiCaprio, an orthopedic specialist (R. at 296-300).  Dr. DiCaprio noted Plaintiff
made good and steady progress with healing after his injury.  Id.  Approximately
seven months after the tibial fracture was sustained, Dr. DiCaprio reported that
Plaintiff was doing well; his walking had improved even though he had soreness
and swelling after sustained activity; he had excellent range of motion in his left
knee; and he had full motor and sensory function in his left distal limb (R. at 296).

Plaintiff followed up regularly with his treating physician, Dr. Kronick,
during the period from Plaintiff's claimed onset of disability in December 2001,
until the date of the ALJ's decision in July 2006.  Plaintiff reported difficulty
walking significant distances, lower back pain, leg pain and swelling after
standing, shortness of breath, occasional diarrhea, fatigue, left shoulder pain,
and depression (R. at 167, 168, 172, 175-176, 177, 212-213, 218-220, 289-290,
287, 288).  Dr. Kronick noted Plaintiff's morbid obesity, and advised him to stop
smoking and lose weight.  Id.  The doctor also recommended Plaintiff increase
his physical activity by walking for 30 minutes daily, and he prescribed
medications to control Plaintiff's non-insulin dependent diabetes mellitus, high
blood pressure, asthma, and hyperlipidemia.  Id.  Dr. Kronick's notes reveal that
when Plaintiff was compliant with taking his medications as directed, these
conditions were under control and created no functional limitations for Plaintiff.

Id.  On March 11, 2005, Dr. Kronick prepared a Physical Capacities Evaluation of Plaintiff (discussed in detail above in this section) that assessed Plaintiff as having the residual functional capacity to perform a limited range of sedentary work (R. at 199-200).  Significantly, neither Dr. Kronick, nor any of Plaintiff's other treating or examining physicians, opined that Plaintiff was totally disabled.  Thus, the ALJ gave great weight to Dr. Kronick's assessment as the doctor had been Plaintiff's primary treating physician for a number of years, and the assessment was consistent with the examination results and opinion of State agency physician Dr. Hanna (R. at 22).

Plaintiff complains that the ALJ disregarded a later Physical Capacities Evaluation completed by Dr. Kronick on August 25, 2006, wherein the doctor opined Plaintiff did not have the residual functional capacity to engage in even a limited range of sedentary work, and had been totally and permanently disabled since the year 2000 (R. at 332-334).  See Plaintiff's Brief, p. 6.  However, the ALJ was unaware of this document as it was prepared by Dr. Kronick approximately one month after the ALJ's decision.  Further, the document was examined by the Appeals Council, but the Appeals Council correctly found it neither material nor relevant to the time frame for Plaintiff's claim (R. at 6-9).

Thus, it is clear from the record that the ALJ did ignore or disregard the medical records and opinion of Plaintiff's treating physician, Dr. Kronick.  Instead, the ALJ gave Dr. Kronick's opinion about Plaintiff's physical capabilities great weight (R. at 22, 199-200).  Further, the ALJ's treatment of Dr. Kronick's evaluation of Plaintiff was supported by detailed reports from Plaintiff's treating

physicians and psychologist, and physical examinations of Plaintiff by two State agency examining physicians (R. at 146-340).  It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.  See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); see also Leach ex. Rel. Murray v. Barnhart, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.") Such reliance is particularly appropriate where, as here, the opinions of the State agency physicians are supported by the weight of the record evidence, including the medical findings of Plaintiff's examining and treating physicians and psychologist.  Further, it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.   See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971). However, in this case, there was no obvious disagreement in the opinions of any of the physicians who examined and/or treated Plaintiff with respect to his functional limitations during the time frame relevant to his claim.  Thus, the Court finds that the ALJ carefully reviewed and acknowledged the medical evidence and opinions contained in Plaintiff's record, including the Physical Capacities Evaluation prepared by Dr. Kronick, gave proper weight to the doctor's opinion,

and based his finding about Plaintiff's residual functional capacity on the totality of evidence available to him on the date of his decision.

>   **d.    The ALJ Properly Evaluated Plaintiff's Credibility When He Determined Plaintiff Retained The Residual Functional Capacity To Perform A Limited Range Of Sedentary Work**

Plaintiff's fourth claim is that the ALJ failed to properly evaluate his credibility in light of the medical evidence and testimony contained in his record, and in doing so, erroneously found that he retained the residual functional capacity to perform a limited range of sedentary work.  See Plaintiff's Brief, pp. 8-15.  As examples, Plaintiff avers he cannot sit, walk or stand for any significant periods because of chronic pain in his back, legs, and feet; he suffers extreme daytime sleepiness because of sleep apnea; he needs constant access to toilet facilities because of severe bowel and bladder urgency; and he can perform almost no household chores or other daily activities because of the limiting effects of his combined impairments.  Id.  Plaintiff alleges that had the ALJ properly evaluated his statements about his pain, fatigue, and other limitations, he would have found him unable to perform even a limited range of sedentary work and, thus, he would be found to be disabled within the meaning of the Act. Id.  The Commissioner argues that the medical evidence was properly evaluated, and the ALJ took into consideration Plaintiff's stated limitations when assessing his residual functional capacity.  See Defendant's Brief, pp. 11-16.

An individual's statements about his or her condition, and the limitations caused by it, are not enough to establish disability.  See 20 C.F.R. § 404.1529. The Commissioner's regulations require that an ALJ consider a claimant's observable signs and laboratory findings, as well as reported symptoms, when

determining whether or not a disability exists within the meaning of the regulations.  Id.

When an ALJ determines a claimant has an underlying physical and/or mental impairment(s) that could reasonably be expected to produce the reported pain or other symptoms, the ALJ must then evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to do work-related activities.  See 20 C.F.R. § 404.1529(c); SSR 96-7p.

Plaintiff's medical evidence clearly establishes he has severe obesity in combination with non-insulin dependent diabetes mellitus, asthma, hyperlipidemia, hypertension, sleep apnea, residual effects from a left tibial fracture and left shoulder injury, and depression and anxiety (R. at 16-24, 146-340).  Without re-stating all of the medical evidence discussed in Sections (a), (b) and (c) above, it is apparent that while Plaintiff suffers serious functional limitations from his obesity, in combination with the residual effects from his left tibial fracture and left shoulder injury, and his depression and anxiety (R. at 148-152, 167, 172, 174, 175-176, 177, 185-188, 199-200, 201-202, 205, 206, 207, 208-209, 212-213, 214-215, 218-220, 272-273, 274, 275, 277-278, 280, 281, 282, 283, 284, 285, 287, 289-290, 291-292, 293-294, 296-300, 301, 310-328, 335-336, 337, 339-340).  However, his other severe impairments of sleep apnea, asthma, hypertension, hyperlipidemia, and non-insulin dependent diabetes are relatively well controlled with treatment and medication.  Id.

After considering the evidence of record, the ALJ found that Plaintiff's underlying medical impairments could reasonably be expected to produce the

symptoms claimed, and that his statements concerning the intensity, persistence, and limiting effects of his reported symptoms were for the most part credible, but not necessarily consistent with a finding of disability (R. at 21).

In his brief, as well as in his testimony before the ALJ, Plaintiff claimed he is unable to perform even simple household chores and other activities (R. at 414-428).  See Plaintiff's Brief, pp. 9-10.  However, his written testimony contained in his Adult Function Report belies this claim (R. at 128-138).  Plaintiff reported he helped his children get ready for school, made lunch for his young son, helped his wife prepare dinner, and drove his wife to and from work on a daily basis (R. at 129,133).  Plaintiff told the ALJ he did not use a computer any longer; yet in his Adult Function Report he listed using a computer as one of his primary afternoon activities (R. at 129, 418).  He reported he shopped for groceries with his wife every two weeks (R. at 132-133).  Moreover, in March 2002, Plaintiff reported to State agency physician, Dr. Chhabra, that while his back bothered him if he stood for more than 30 minutes at a time, and he could not walk long distances, he could take care of his children, cook, clean, do laundry, shopping, and manage money (R. at 148-149).  He reported he was independent with bathing and dressing (R. at 149).  Almost two years later, in January 2004, Plaintiff was examined by another State agency physician, Dr. Hanna (R. at 185-188).  He reported mild to moderate shortness of breath with prolonged walking, but did not complain of back pain with standing (R. at 185).  Plaintiff told Dr. Hanna he was able to cook, clean, do laundry, and care for his children, and was independent with bathing and dressing (R. at 186).  Such

varied activities performed on a regular basis are inconsistent with Plaintiff's claim of total disability.

With respect to Plaintiff's claim of fatigue and excessive daytime sleepiness, the ALJ noted that prior to April 2005, the Bi-Pap machine used by Plaintiff had not been re-titrated in over seven years (R. at 19).  However, after Plaintiff received a new BiPap machine, and was 100 percent compliant with its use, his physician reported that he was doing well (R. at 275).  A later report from Plaintiff's doctor submitted to the Appeals Council documented that Plaintiff had excellent control of his sleep apnea and averaged just under eight hours of sleep per night (R. at 337).  Plaintiff reported to the ALJ that he took a nap for two and one-half hours each afternoon because I get tired" (R. at 419.  However, he also said "it takes me a long time to get to sleep, so half the time I'm just laying there anyway. It is mostly because my legs start bothering me, and I want like, my legs stretched out." (R. at 419-420).  The court notes the medical evidence does not contain entries from any of Plaintiff's treating physicians prescribing a lengthy afternoon nap to treat his impairments.

Plaintiff further alleges the ALJ disregarded his claims of diarrhea and urinary urgency of such frequency that these conditions would have made it impossible for him to engage in substantial gainful activity (R. at 430-433).  When Plaintiff was asked if he wore protective undergarments, he said he did not (R. at 432).  Plaintiff's medical record reveals he reported intermittent diarrhea to his doctor, but the doctor's notes contain no information about urination until August 25, 2006, when the doctor recorded "No dysuria, urgency or incontinence" (R. at

218-220, 335).  Given that Plaintiff has documented non-insulin dependent diabetes mellitus along with other conditions for which he takes medication, it is reasonable to assume that his long-time treating physician would have prescribed treatment for daily episodes of diarrhea, would have inquired about urinary frequency and urgency at each visit, and would have entered information about problems of this nature into Plaintiff's medical record.  When evaluating a claimant's complaints, an ALJ may rely not only on what the record says, but also what the record does not say.  See  Dumas v. Schweiker, 712 F. 2d 1545, 1552-1553 (2d Cir. 1983) ("At no point in the medical record are his headaches described in such severe terms as he now employs. Indeed, he twice described his headaches as only infrequent.")

Despite Plaintiff's assertion that the ALJ did not correctly evaluate the medical evidence in the record when assessing the credibility of his statements regarding pain and limitations, it is clear to the Court from the ALJ's decision that he carefully examined and considered Plaintiff's claims in light of all of the evidence of record.  Indeed, the ALJ did not doubt Plaintiff experienced pain and discomfort.  However, disability requires more than the ability to work without pain.  See Dumas v. Schweiker, 712 F. 2d 1545, 1552 (2d Cir. 1983).  Pain, either by itself or in combination with a claimant's documented impairments, must be of such intensity that it would preclude any substantial gainful activity.  Id.  The ALJ acknowledged Plaintiff could not stand for long periods of time or walk significant distances, could not sit for long periods of time without an opportunity to get up, stretch, and change position to alleviate pain, could not lift or carry

heavy items, and had numerous postural limitations; in fact, when restricting

Plaintiff's residual function capacity to a limited range of sedentary work, he

incorporated many of the limitations Plaintiff claimed in his hearing testimony,

and most of the limitations claimed in his Adult Function Report (R. at 20-22, 133,

413-420).

Thus, the Court finds the ALJ properly considered Plaintiff's symptoms,

complaints of pain, and reported limitations, along with the medical and other

evidence in the record, and further finds the totality of evidence does not

substantiate Plaintiff's claims that his pain, daytime sleepiness and fatigue, and

other symptoms are disabling within the meaning of the Act.  Accordingly, the

ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony,

presented a summary of his evaluation, and rendered an independent judgment

regarding the extent of Plaintiff's subjective complaints based on the objective

medical and other evidence (R. at 15-16).  See e.g. Mimms v. Sec'y of Health

and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).  Further, because the ALJ

found Plaintiff's claims of pain and limitations from his severe impairments to be

mostly credible, he determined Plaintiff could not return to his past relevant work

and could, at most, engage in a limited range of sedentary work (R. at 20-22).

The ALJ incorporated most of Plaintiff's claimed limitations into a hypothetical

presented to a vocational expert who testified that, even given these limitations,

there were a significant number of jobs in the national and local economies

available to Plaintiff.

## Conclusion

After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians and the State agency medical consultant, and afforded Plaintiff's subjective claims of pain and limitations an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is DENIED.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated:  September 3, 2009
        Albany, New York